## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **WALLACE BOLDEN, GREGORY CHISM,** | ) | |
| **DONALD DUNCAN, LINDELL EPPS,** | ) | |
| **JAMES GAGE, MARVIN GREEN,** | ) | |
| **TERRANCE JACKSON, JOE JONES, EDDIE** | ) | |
| **LUCAS, GUY SUTTON, JACKIE WHITE,** | ) | |
| **and ZELMA WHITE, on behalf of themselves** | ) | **No. 06 C 4104** |
| **and all others similarly situated,** | ) | |
| | ) | **Judge Joan H. Lefkow** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **WALSH GROUP, doing business as WALSH** | ) | |
| **CONSTRUCTION COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Twelve construction workers filed this putative class action against Walsh Construction

Company ("Walsh"), alleging that Walsh discriminates against black employees in violation of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Civil

Rights Act of 1866, 42 U.S.C. § 1981, as amended.  Before the court is plaintiffs' motion to

certify four classes under Federal Rule of Civil Procedure 23(b)(2) and (b)(3).  For the following

reasons, plaintiffs' motion for class certification [#128] is granted in part and denied in part.[1]

---

[1] In a companion opinion and order, this court denies Walsh's motion to strike the EEOC
Investigative Memorandum and EEOC Determinations submitted by plaintiffs in support of their motion
for class certification.  This court also grants in part and denies in part Walsh's motion to strike the report
and testimony of plaintiffs' expert, Stan V. Smith.

## BACKGROUND

### I. Walsh Construction Company

Walsh is a construction company that does business throughout the United States and employs thousands of laborers during any given year. From 2000 to 2009, Walsh employed approximately 2,610 journeymen and 175 foremen on 262 construction projects in the Chicago area.[2]

The typical construction project is managed independently, with little oversight from Walsh's corporate office. Usually, a project manager or business group leader selects a superintendent. The superintendent supervises foremen, and either the superintendent or the foremen hire journeymen and assign their tasks. Foremen supervise the journeymen, who are usually assigned to crews that have specialized responsibilities such as pouring concrete or directing trucks. The number of employees who work on a crew and the amount of work vary among job sites.

Walsh does not have a policy for hiring journeymen, and decisions regarding hiring are left to the discretion of the superintendents and foremen. Neither does Walsh have a policy regarding layoffs. Layoffs are common at Walsh and in the rest of the construction industry.

Superintendents and foremen also have the discretion to assign overtime work. Pursuant to Walsh's collective bargaining agreement with the laborers' union, the union may designate certain laborers as union stewards. Stewards have the right of first refusal for any overtime.

---

[2] The parties alternately refer to "laborers," "journeymen laborers" and "journeymen." The court uses the term "journeymen" to denote laborers who have not been promoted to the foreman position.

Overtime is voluntary, which means that journeymen have the right to reject overtime that is offered.

Walsh's official employment policy prohibits discrimination or harassment based on race. (*See* Walsh Employee Handbook at 13.) Walsh provides anti-discrimination training to its superintendents and foremen through the Human Resources Department.

## II.     Plaintiffs' Allegations and Motion for Class Certification

The named plaintiffs, Wallace Bolden, Gregory Chism, Donald Duncan, Lindell Epps, James Gage, Marvin Green, Terrance Jackson, Joe Jones, Eddie Lucas, Guy Sutton, Jackie White, and Zelma White, all of whom are black, were journeymen or foremen at Walsh. Although plaintiffs worked on various construction sites during their tenure at Walsh, most were employed on a project known as "Skybridge," which was a commercial and residential building project that began in 2000. When Skybridge first began, John Taheny was the superintendent and Robert Kuna was the foreman. Skybridge was temporarily shut down for financial reasons, and during this time Taheny and Kuna worked on another residential building project known as Park Place. When Skybridge resumed, Jim Grumber was the project superintendent, Arthur Crummie was a carpenters' foreman and plaintiff Jackie White was a laborers' foreman. Taheny, Kuna, Grumber, and Crummie are white. Plaintiffs Chism, Gage, and Lucas were employed in Walsh's roving concrete crew, referred to as the Concrete Laborers Division, which poured concrete at various construction sites. Robert DeBoer, who is white, supervised the concrete crew.

Between February 2002 and January 2003, each plaintiff filed a charge of discrimination with the EEOC alleging discrimination on the basis of race. (Compl. Ex. A, Plaintiffs' EEOC

Charges.) The EEOC determined that there was reasonable cause to believe that Walsh had discriminated against each plaintiff, as well as other black employees, through its hiring and layoff practices and by harassing black employees and subjecting them to different terms and conditions of employment. (*See* Compl. Ex. B, EEOC Determinations for Named Plaintiffs; Pls.' Ex. 2, EEOC Investigative Memorandum.) The EEOC concluded that the evidence did not support the conclusion that Walsh discriminated against black employees by paying lower wages or denying overtime or bonuses. (*See* Pls.' Ex. 2, EEOC Investigative Memorandum.)

Asserting both disparate treatment and disparate impact theories of liability, plaintiffs' complaint alleges that Walsh discriminates against black employees through its hiring, firing, job assignment, and compensation practices. Plaintiffs also allege that the working conditions at Walsh amounted to a hostile work environment.

The parties conducted extensive expert and non-expert discovery before plaintiffs filed their motion for class certification. Plaintiffs' expert, Stan V. Smith, conducted a statistical analysis of time card data provided by Walsh to determine whether Walsh's allegedly discriminatory behavior had a common impact on the putative class members. He examined time card data for employees in the Chicago area that include an employee's race, position (such as journeyman or foreman), the job and job location, union membership and position, and designation of hours as regular, overtime, or double time. Smith concluded that Walsh hires fewer black employees and that black employees work fewer hours, receive less overtime, receive fewer promotions, and are terminated more often than non-black employees. Walsh hired its own expert, Robert Topel, who concluded that Smith had erred by concluding that the relevant labor market is the entire black population in Cook County rather than the population of

qualified blacks living in the Chicago Metropolitan area. Topel also concluded that Smith's analysis of the time card data is fundamentally flawed because it compares black employees to all non-black employees, rather than performing comparisons between blacks, whites, and Hispanics. Walsh has filed a motion to strike Smith's expert report and testimony, which the court grants in part and denies in part in a companion opinion and order. As explained therein, Smith's conclusions regarding Walsh's hiring and termination practices, the decline in the number of hours worked by black employees, and his calculation of "hedonic damages" are inadmissible under the Federal Rules of Evidence and *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Walsh's motion to strike is denied with respect to Smith's analysis of the disparities in hours worked, compensation received, and promotions from journeyman to foreman.

Plaintiffs now seek to certify the following classes:

"**Hostile Work Environment Class**," comprising all blacks employed by Walsh at any time between June 1, 2001, and the present.

"**Hire, Re-Hire and Promotion Class**," comprising all blacks employed by Walsh at any time during the period June 1, 2001, [through] the present, who were denied hire, re-hire/re-call, promotions or deprived of the ability to pursue promotions because of their race.

"**Work Hours and Compensation Class**," comprising blacks employed by Walsh at any time during the period June 1, 2001, through the present, who were denied opportunities to work, not afforded overtime hours or not afforded premium pay hours, because of their race.

"**Layoff and Termination Class**," comprising all blacks, employed by Walsh at any time during the period June 1, 2001, [through] the present, who were laid off or terminated because of their race.

(Pls.' Mot. for Class Cert. at 2–3.) Although plaintiffs' proposed class definitions include no job or geographic limitations, plaintiffs now represent that the classes may be limited to the Chicago

5

Metropolitan area and to blacks who were employed as journeymen. (Pls.' Resp. to Walsh's

Mot. to Supp., Dkt. #162.) Plaintiffs request that the court either certify all classes under Rule

23(b)(3) or bifurcate the proceedings and certify a hybrid class under Rule 23(b)(2) for equitable

relief and Rule 23(b)(3) for damages.

## REQUIREMENTS FOR CLASS CERTIFICATION[3]

A party seeking to certify a class action must meet two conditions. First, the movant

must show the putative class satisfies the four prerequisites of Rule 23(a): (1) numerosity, (2)

commonality, (3) typicality, and (4) adequacy of representation. Fed. R. Civ. P. 23(a);

*Oshana* v. *Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006); *Rosario* v. *Livaditis*, 963 F.2d

1013, 1017 (7th Cir. 1992). Second, the action must qualify under at least one of the three

subsections of Rule 23(b). Fed. R. Civ. P. 23(b); *Rosario*, 963 F.2d at 1017; *Hardin* v.

*Harshbarger*, 814 F. Supp. 703, 706 (N.D. Ill. 1993). Here, plaintiffs seek certification under

Rule 23(b)(2) or (b)(3). Rule 23(b)(2) requires a finding that "the party opposing the class has

acted or refused to act on grounds that apply generally to the class, so that final injunctive relief

or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ.

P. 23(b)(2). Rule 23(b)(3) requires a finding that "questions of law or fact common to the

members of the class predominate over any questions affecting only individual members, and

---

[3] Both parties have supplemented their briefs to address the Supreme Court's decision in *Wal-Mart Stores, Inc.* v. *Dukes*, --- U.S. ----, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011), and several recent Seventh Circuit decisions that were decided after formal briefing was complete. *See McReynolds* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, --- F.3d ----, 2012 WL 592745 (7th Cir. Feb. 24, 2012); *Ross* v. *RBS Citizens, N.A.*, 667 F.3d 900 (7th Cir. 2012); *Messner* v. *Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012).

that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Courts retain broad discretion in determining whether a proposed class meets the Rule 23 certification requirements. *Keele* v. *Wexler*, 149 F.3d 589, 592 (7th Cir. 1998). "Plaintiffs bear the burden of showing that a proposed class satisfied the Rule 23 requirements, but they need not make that showing to a degree of absolute certainty." *Messner* v. *Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012) (internal citation omitted). "It is sufficient if each disputed requirement has been proven by a preponderance of evidence." *Id.* (citation omitted). The court must "carefully apply the requirements of Rule 23(a) to Title VII class actions," *Gen. Tel. Co. of the Sw.* v. *Falcon*, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982), and "precise pleadings" are needed, because without specificity the court cannot define the class or determine the adequacy of representation, and the employer does not know how to defend. *Id.* at 160–61 (citation omitted).

## ANALYSIS

## I. Whether there are Questions of Law or Fact Common to the Class

Walsh vigorously disputes that plaintiffs have satisfied Rule 23(a)(2)'s commonality requirement.[4] It argues that plaintiffs cannot meet the commonality requirement because their claims are premised on the alleged illegality of myriad employment decisions made by numerous managers at hundreds of construction sites. Thus, concludes Walsh, the viability of each class members' claim will turn on individual, as opposed to class-wide, issues of fact and law.

---

[4] Walsh does not challenge that plaintiffs have satisfied the numerosity requirement of Rule 23(a)(1).

For the commonality requirement to be met, "there must exist 'questions of law or fact common to the class.'" *Keele*, 149 F.3d at 594 (quoting Fed. R. Civ. P. 23(a)(2)). A single common question is enough.[5] *Ross* v. *RBS Citizens, N.A.*, 667 F.3d 900, 908 (7th Cir. 2012) (citing *Wal-Mart Stores, Inc.* v. *Dukes*, --- U.S. ----, 131 S. Ct. 2541, 2556, 180 L. Ed. 2d 374 (2011)). Plaintiffs must show that class members "have suffered the same injury." *Falcon*, 457 U.S. at 157. "What matters to class certification . . . is . . . the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of litigation." *Ross*, 667 F.3d at 908 (quoting *Wal-Mart*, 131 S. Ct. at 2551 (emphasis in original)).[6]

Application of the commonality requirement must be measured against the "important development in the law"[7] expressed in *Wal-Mart*.[8] There, the Court concluded that neither a disparate impact nor a disparate treatment sex discrimination claim met the commonality requirement. As distilled by Circuit Judge Posner in *McReynolds* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, --- F.3d ----, 2012 WL 592745, at *5 (7th Cir. Feb. 24, 2012),

---

[5] Although *Ross* uses the term "common claim," it cites the Supreme Court's statement in *Wal-Mart*, "We quite agree that for purposes of Rule 23(a)(2) even a single common question will do." *See* 131 S. Ct. at 2556 (quotation marks and citations omitted).

[6] The Seventh Circuit has not been consistent in its short form of *Wal-Mart* v. *Dukes*. This opinion uses *Wal-Mart* even where a Seventh Circuit case refers to it as *Dukes*.

[7] *McReynolds*, 2012 WL 592745, at *5.

[8] The plaintiffs in *Wal-Mart* alleged disparate treatment and disparate impact claims on behalf of 1.5 million putative class members, all current or former Wal-Mart employees who alleged that Wal-Mart discriminated against them on the basis of their sex by denying them equal pay or promotions. *See* 131 S. Ct. at 2547. The plaintiffs did not allege that Wal-Mart had an express corporate policy against the advancement of women but, instead, asserted that "local managers' discretion over pay and promotions [was] exercised disproportionately in favor of men, leading to an unlawful disparate impact on female employees." *Id.* at 2548. The plaintiffs further alleged that because Wal-Mart knew that the policy had a discriminatory effect, the refusal to limit local managers' discretionary authority amounted to disparate treatment under Title VII. *Id.*

> *Wal-Mart* holds that if employment discrimination is practiced by the employing company's local managers, exercising discretion granted them by top management (granted them as a matter of necessity, in Wal-Mart's case, because the company has 1.4 million U.S. employees), rather than implementing a uniform policy established by top management to govern the local managers, a class action by more than a million current and former employees is unmanageable; the incidents of discrimination complained of do not present a common issue that could be resolved efficiently in a single proceeding.  Fed. R. Civ. P. 23(a)(2).

The Seventh Circuit in *McReynolds* ruled that the commonality requirement was met where an employer had a company-wide "teaming policy," which delegated to local brokers the formation of broker teams, and an "account distribution policy," which awarded accounts based on past revenue generation by brokers.  It decided that whether the policies cause racial discrimination and whether they are justified by business necessity are issues common to the entire class and appropriate for class-wide determination.  *See id.* at *8.

 Plaintiffs, seeking to navigate the waters between *Wal-Mart* and *McReynolds*, assert that Walsh has a company-wide policy of setting up each project as, essentially, its own business, with no material oversight of supervisors.  (Dkt. No. 172 at 4, ¶ 6.)  (They set out a number of variations of the same policy, such as a policy of gate hiring (*id.* ¶ 7(d)), as well as a policy of not addressing complaints of discrimination and racial harassment (*id*. ¶ 7(h)).)  Walsh, on the other hand, urges the court to conclude that *Wal-Mart* forecloses a class action where the alleged policy is delegation of employment decisions to the discretion of local managers.

One possible distinction between *McReynolds* and *Wal-Mart* (other than the comparative size of the putative classes) is the presence in *McReynolds*, and the absence in *Wal-Mart*, of a company-wide policy more definite than that of granting all hiring and promotion decisions to local managers.  On examination, however, this distinction seems razor-thin.  Wal-Mart's local

managers were given broad discretion to hire, set wages and hours, promote and dismiss

employees, which led the Supreme Court to conclude that the experiences of the representative

plaintiffs and the statistical evidence did not permit an inference of a discriminatory policy.

Merrill Lynch's local brokers were required by company-wide policy to form teams but the

individual brokers decided who would be on their teams, resulting in individualized decisions

that tended to exclude black brokers.  Both cases concern a company-wide policy of delegation

of discretionary authority to a low-enough level that employment decisions are based on the

decider's personal comfort level, resulting in a statistical disparity disfavoring a protected class.[9]

In its police department hypothetical (set out in the margin[10]), the court in *McReynolds* states that

a department-wide policy of granting patrol officers discretion in choosing their partners is "not

---

[9] The *McReynolds* court suggested that, unlike the *Wal-Mart* situation, the team policy and the account distribution policy at Merrill, Lynch might be shown to *increase* the amount of discrimination over that which would be present if total discretion were delegated to local managers.  This presupposes, however, that total discretion would produce discrimination.  If so, then it, too, would be a policy subject to challenge.

[10] *See McReynolds*, 2012 WL 592745, at *7:

Suppose a police department authorizes each police officer to select an officer junior to him to be his partner.  And suppose it turns out that male police officers never select female officers as their partners and white officers never select black officers as their partners.  There would be no intentional discrimination at the departmental level, but the practice of allowing police officers to choose their partners could be challenged as enabling sexual and racial discrimination—as having in the jargon of discrimination law a "disparate impact" on a protected group—and if a discriminatory effect was proved, then to avoid an adverse judgment the department would have to prove that the policy was essential to the department's mission. 42 U.S.C. § 2000e–2(k)(1)(A)(i); *Ricci v. DeStefano*, 557 U.S. 557, 129 S. Ct. 2658, 2672–73, 174 L. Ed. 2d 490 (2009); *Bryant v. City of Chicago*, 200 F.3d 1092, 1098–99 (7th Cir. 2000).  That case would not be controlled by *Wal-Mart* (although there is an undoubted resemblance), in which employment decisions were delegated to local managers; it would be an employment decision by top management.

controlled by Wal-Mart" because the delegation of discretion came from the top.[11]  The policy of delegating discretion to patrol officers to pick their partners is difficult to distinguish from a policy of delegation of discretion to superintendents at the job site to pick the journeymen they hire, promote, lay off, and fire.  At the same time, it is difficult to distinguish from *Wal-Mart*, if viewed from the stance that each job site is a free-standing "company" that sets its own policy and entails hundreds of individualized decisions on a continual basis.  *McReynolds* does not address the quantity or quality of proof supporting the finding of commonality and it is unclear what proof could ultimately result in an inference that Merrill Lynch had discriminatory intent.

Ultimately, this court takes its cue from the Seventh Circuit's characterization in *McReynolds* of *Wal-Mart*'s holding: "*Wal-Mart* holds . . . a class action by more than a million . . . is unmanageable [and] the incidents of discrimination complained of do not present a common issue that could be resolved efficiently in a single proceeding."  2012 WL 592745, at *5.  This language implies that the Seventh Circuit reads *Wal-Mart* as a case where the difficulties of manageability and lack of efficiency overwhelmed any potential common issue based on delegation of authority.  Or as *Falcon* teaches, without specificity, it was impossible to define the class or determine adequacy of representation, and the employer could not know how to defend.

The conclusion of this dissertation, then, is that the question whether Walsh's company-wide policy of delegating to job site superintendents discretionary authority to make employment

---

[11] Moreover, *Wal-Mart* acknowledges "that, in appropriate cases, giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory—since 'an employer's undisciplined system of subjective decisionmaking can have precisely the same effects as a system pervaded by impermissible intentional discrimination.'" 131 S. Ct. at 2554 (quoting *Watson* v. *Ft. Worth Bank & Trust*, 487 U.S. 977, 990–91, 108 S. Ct. 2777, 101 L. Ed. 2d 827 (1988) (brackets omitted)).

decisions at the job site discriminates against black journeymen and foremen and whether that policy is justified by business necessity may be common questions, if plaintiffs can demonstrate an evidentiary basis for their class definition.

## A.    Disparate Treatment Class

Under a disparate treatment theory, a plaintiff must prove discriminatory motive by relying on either direct or circumstantial evidence of intentional discrimination. *Int'l Brotherhood of Teamsters* v. *United States*, 431 U.S. 324, 335 n.15 & 336, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977).[12] This is an uphill climb under *Wal-Mart*. The Court emphasized that, in resolving a disparate treatment claim, "the crux of the inquiry is 'the reason for a particular employment decision.'" 131 S. Ct. at 2552 (quoting *Cooper* v. *Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876, 104 S. Ct. 2794, 81 L. Ed. 2d 718 (1984)). Class plaintiffs must be able to establish by a preponderance of the evidence that "examination of all the class members' claims for relief will produce a common answer to the crucial question *why I was disfavored*." *Id.* (emphasis in original). They must "identify a common mode of exercising discretion that pervades the entire company." *Id.* at 2454–55. To paraphrase *Falcon*, the representative plaintiffs must not only demonstrate the validity of their own claims, they must present proof (1) that this discriminatory treatment is typical of the employer's challenged employment practices, (2) that the employer's practices are motivated by a policy of race discrimination that pervades the company, or (3) that this policy of race discrimination is reflected in the employer's other employment practices. *See* 457 U.S. at 158. As indicated in *Wal-Mart*, the evidence needs to

---

[12] Courts analyze discrimination claims under Section 1981 in the same manner as claims brought under Title VII. *Bratton* v. *Roadway Package Sys., Inc.*, 77 F.3d 168, 176 (7th Cir. 1996).

point to a conclusion that employment decisions are determined by "stereotyped thinking."

131 S. Ct. at 2554 (citation omitted).

The types of evidence that are available, statistical, anecdotal, and sociological, are relevant, but *Wal-Mart* is not clear about how much evidence is enough. *See id.* at 2555 (establishing a disparity in pay or promotion patterns does not demonstrate commonality); *id.* at 2556 (anecdotal evidence must be sufficient to raise an inference that all the individual, discretionary personnel decisions are discriminatory); *id.* at 2553–54 (expert sociological testimony that the corporate culture makes the employer vulnerable to bias is useless unless it can demonstrate how regularly "stereotyped thinking" determines employment decisions). Plaintiffs here have submitted valid statistical evidence indicating that Walsh's policy of supervisory discretion resulted in fewer work hours, less overtime, and fewer promotions for black journeymen.[13] Plaintiffs have also submitted anecdotal evidence comprising (1) EEOC charges filed by former Walsh employees, (2) Walsh's position statement in response to a former employee's charge of discrimination, and (3) declarations and deposition testimony of named plaintiffs and some putative class members.

The sixteen EEOC charges provide only limited support for plaintiffs' motion for class certification. Eight charges were filed by individuals who were not journeymen and therefore not class members. (*See* Pls.' Ex. 12, Charge filed by Clay (project manager); Ex. 13, Charge filed by Bredy (assistant analyst); Ex. 20, Charge filed by McKinley-Wadlington (safety secretary); Ex. 21, Charge filed by Clark (administrative assistant); Ex. 22, Charge filed by

---

[13] As discussed *supra*, the court granted Walsh's motion to strike plaintiffs' statistical analysis of Walsh's hiring and discharge practices.

Jackson (project engineer); Ex. 23, Charge filed by Thompson (project engineer); Ex. 24, Charge filed by Melton (operating engineer); Ex. 25, Charge filed by McDuff (truck driver).) Plaintiffs have cited no evidence suggesting that complaints filed by individuals other than journeymen might be relevant to plaintiffs' class claims. Of the eight charges filed by journeymen, two involve allegations of racial harassment and intimidation that would only support plaintiffs' hostile work environment claim.[14] (*See* Pls.' Ex. 9, Charge filed by Thompson; Ex. 10, Charge filed by Britt.) Two other journeymen claimed that they had been denied hire in August and September 2000, possibly by the same supervisor. (*See* Pls.' Ex. 11, Charge filed by Reed (denied hire by "Bob Cooney"); Ex. 19, Charge filed by Sutton-Paskett (denied hire by "Bob Cohen").) The four remaining charges allege discriminatory layoff or discharge but do not name a specific work site or supervisor. (*See* Pls.' Ex. 14, Charge filed by Peoples; Ex. 16, Charge filed by Hickman; Ex. 17, Charge filed by Smith; Ex. 18, Charge filed by Rowe.)

Walsh's position paper regarding a charge of discrimination filed by Devell Brittmon, a journeyman, indicates that Brittmon alleged that he had been laid off after taking an extended medical leave from the Park Place project in 2001. (*See* Pls.' Ex. 15 at WALSH000779.) It also appears that Brittmon alleged that he had been denied work at "several other" construction sites. (*Id.* at WALSH000780.)

Finally, Walsh has submitted declarations and deposition testimony from Guy Sutton, Eddie Lucas, Keith Hudson, Marvin Greene, Jeff Carroll, and Wallace Bolden, all of whom are putative class members or named plaintiffs. Sutton testified that blacks were required to do more

---

[14] Carla Rowe did not specify her position, but she alleged that her wrist was "broken during work" and stated that she was laid off after she requested work from a white superintendent. (*See* Pls.' Ex. 18.) These allegations suggest that she was a journeyman laborer.

heavy lifting and strenuous work than non-blacks. Hudson, Greene, and Carroll testified that blacks were laid off more frequently than non-blacks at the Cook County Hospital, The Heritage, The Columbian, Millennium Park, and Brooks Homes sites. Bolden, Greene, Hudson, and Lucas testified that blacks did not get as many hours or as much overtime as non-blacks at the Skybridge, McCormick Place, Millennium Park, Brooks Homes, Cook County Hospital, The Heritage, and The Columbian sites.

Despite the lack of guidance on the type and quantity of evidence that would be sufficient, this court concludes that plaintiffs fall short of the threshold. *Wal-Mart* indicates that plaintiffs' limited statistical evidence, which is the only evidence of company-wide disparities at Walsh, does not demonstrate that there was a common practice of intentional discrimination at Walsh's individual work sites, which is the key issue presented by plaintiffs' disparate treatment claims. *See* 131 S. Ct. at 2554 (because of the subjective nature of each supervisor's employment decisions, "demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's"); *id.* at 2555–56. Plaintiffs have not submitted any anecdotal evidence to support their claim for failure to promote. Plaintiffs' anecdotal evidence of discriminatory work hours and overtime practices is limited to seven out of the 262 construction sites that Walsh operated during the relevant time period. Their anecdotal evidence of discriminatory layoff and termination practices is limited to five constructions sites. This showing is too weak to support the conclusion that there will be a common question of whether supervisors at all of Walsh's construction sites engaged in "stereotyped thinking" that adversely affected black journeymen. *See Wal-Mart*, 131 S. Ct. at 2556 & n.9. The court will not certify a disparate treatment class.

15

### B.        Disparate Impact Class

Disparate impact liability is premised on the notion that a facially neutral policy results in discrimination against members of a protected class. *Teamsters*, 431 U.S. at 355 n.15 & 336. It does not require proof of discriminatory intent, alleviating the plaintiffs' burden of proof compared to a disparate treatment claim. *See Griggs* v. *Duke Power Co.*, 401 U.S. 424, 431, 91 S. Ct. 849, 28 L. Ed. 2d 158 (1971) ("If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited."); *see also Allen* v. *City of Chicago*, 351 F.3d 306, 311 (7th Cir. 2003) ("To succeed on a disparate impact claim, plaintiffs bear the burden of showing that a particular employment practice causes a disparate impact on the basis of race. Once this impact is shown, the defendant must demonstrate that the practice is job related and consistent with business necessity." (quotations and citations omitted)). Certainly, the types of evidence described in *Wal-Mart* are all relevant, although valid statistical analysis is essential. Anecdotal evidence is more likely to demonstrate that the disparity is spread throughout the company. *See Ross*, 667 F.3d at 909–10 (in wage and hour case, plaintiffs had demonstrated commonality of issue where they submitted declarations from ninety-six potential class members, who together worked at approximately eighty-three percent of the defendant's Illinois branches).

Plaintiffs rely on the same evidence, summarized *supra*, to support certification of their disparate treatment and disparate impact claims. Although this evidence is not sufficient to support certification of a disparate treatment class, it does support the conclusion that there are common questions of law or fact with respect to a subset of plaintiffs' disparate impact classes.

16

Specifically, plaintiffs have demonstrated that Walsh's official policy is to allow superintendents and foremen complete discretion in assigning work hours and overtime. Although journeymen have the right to refuse overtime, because it is voluntary, there is no evidence that journeymen are entitled to request additional overtime if they do not feel that it is being distributed fairly.[15]  According to plaintiffs, Walsh's superintendents and foremen tend to offer overtime and work hours to non-black journeymen in the first instance.  This allegation is supported by statistical analysis showing that black journeymen, on average, receive fewer hours than non-black journeymen.  To paraphrase *McReynolds*, whether Walsh's policy of allowing foremen and superintendents to assign work hours and overtime without reference to any objective criteria has a negative impact on black journeymen, and whether this policy is justified by business necessity, are issues common to the entire class.  *See* 2012 WL 592745, at *7–8.  An individualized assessment of each journeyman's circumstances is not necessary to determine that Walsh's company-wide policy results in the denial of work hours and overtime pay.  *See Ross*, 667 F.3d at 910.

Plaintiffs have also demonstrated that there are common issues of fact with respect to the promotion class.  Walsh does not contest plaintiffs' assertion that a supervisor's decision to promote a journeyman to the foreman position is completely discretionary and that Walsh does not have any objective promotion criteria in place.  According to plaintiffs, this is an employment decision made by top management that results in discrimination against black

---

[15] For example, when one of Walsh's senior project managers was asked whether there is anything he does to make sure that project overtime is being assigned fairly, he responded, "Usually it's done by, you know, who wants to work it, who's available to work it.  You know, so it usually kind of goes voluntarily."  (Def.'s Ex. 9, Logan Dep. at 73.)

journeymen. Whether Walsh's policy of allowing foremen and supervisors to make promotion decisions without reference to any objective criteria, and whether this policy is justified by business necessity, are issues common to the entire class. *See McReynolds*, 2012 WL 592745, at *7–8.

Plaintiffs have not, however, established that there are issues common to the layoff/termination or hire/rehire classes. The court has granted Walsh's motion to exclude Smith's analysis of Walsh's termination, hire, and rehire data. Without any valid statistical evidence, plaintiffs are left with a handful of anecdotes that relate to a small fraction of Walsh's construction sites. Given the myriad supervisors and employment decisions at issue, this is not enough to demonstrate that there is a "common nucleus of operative fact," *Rosario*, 963 F.2d at 1018, among the class grievances. Indeed, plaintiffs do not even argue that the court may certify their proposed classes if it rules that Smith's expert report is inadmissible. Accordingly, plaintiffs' motion to certify a layoff/termination class and hire/rehire class will be denied.

## C. Hostile Work Environment Class

In order to succeed on their hostile work environment claim, plaintiffs will need to prove (1) that harassment was based on race; (2) that it was subjectively and objectively hostile; (3) that it is sufficiently severe or pervasive to interfere with an employee's ability to perform assigned duties; and (4) that there is a basis for employer liability. *See, e.g., Mason* v. *S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000). A hostile work environment claim, like a disparate impact claim, does not require proof of discriminatory intent. *See Huff* v. *Sheahan*, 493 F.3d 893, 902–03 (7th Cir. 2007). An employer can avoid liability for a supervisor's harassing conduct if no tangible employment action was taken and it can

18

demonstrate (1) that it exercised reasonable care to prevent and correct any harassing behavior, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities. *See Huff*, 493 F.3d at 898–901 (discussing *Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998); *Faragher* v. *City of Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)). Prior to *Wal-Mart*, numerous courts recognized that whether there is an "overarching and pervasive hostile work environment" can present a common question of fact or law that satisfies Rule 23(a)(2). *See, e.g.*, *Smith* v. *Nike Retail Servs., Inc.,* 234 F.R.D. 648, 660 (N.D. Ill. 2006); *Wilfong* v. *Rent-A-Center, Inc.*, No. 00 CV 680, 2001 WL 1795093, at *5 (S.D. Ill. Dec. 27, 2001); *Adams* v. *R.R. Donnelley & Sons*, Nos. 98 C 4025, 96 C 7717, 2001 WL 336830, at *13 (N.D. Ill. Apr. 6, 2001); *Warnell* v. *Ford Motor Co.*, 189 F.R.D. 383, 387–88 (N.D. Ill. 1999); *Markham* v. *White*, 171 F.R.D. 217, 222–23 (N.D. Ill. 1997).

Plaintiffs have submitted voluminous testimony, affidavits, and the EEOC Investigative Memorandum showing that supervisors at the Skybridge and Park Place jobs referred to black employees as "niggers," "coons," "monkeys," "possums," "squirrels," "black-bitches," "black mother-fuckers," and other derogatory names. Blacks were also referred to as lazy and worthless employees who didn't want do any work. For example, plaintiffs' evidence indicates that Arthur Crummie, the carpenter's foreman on the Skybridge project, stated that he resented that he had to hire blacks and that Walsh didn't need the "monkeys" any more because he could give work to Mexicans, whom he referred to as the "new niggers." Plaintiffs have submitted evidence that Robert DeBoer, the supervisor of the Concrete Laborers Division, made similarly offensive

comments and stated that black workers, in comparison to Hispanics and whites, were lazy and dirty.

The named plaintiffs also testify that they saw offensive graffiti in Walsh's portable toilets at multiple sites, including statements such as "niggers go home," swastikas, "KKK," and "sending you back to Africa."  Employees saw multiple hangman's nooses at Walsh sites, including The Heritage and Millennium Park.  Plaintiff James Gage testified that a noose was hanging from the ceiling of the break shanty at the Schaumburg site for about two weeks.  (Gage Dep. at 33–35.)

Plaintiffs' evidence demonstrates that there is a common issue of fact as to whether Walsh management knew of its supervisors' harassing conduct at various construction sites and yet allowed supervisors to act with unfettered discretion on the job.  The record makes clear that certain supervisors, such as Robert Kuna, were known by Walsh management to be overt racists but were unchastened and allowed to supervise multiple job sites over the course of several years.[16]  The evidence also indicates that other supervisors explicitly or implicitly condoned their

---

[16] John Taheny, who was Kuna's supervisor at Skybridge, testified that he had heard rumors that Kuna was racist before they worked together.  Taheny testified that Kuna was a "bigot" who used the word nigger "every other word" and that as a result Taheny "got him fired."  Taheny further testified that he had to go to his boss to fire Kuna, even though he was Kuna's supervisor, because Kuna knew Dan Walsh and had "friends within the company."

colleagues' racist conduct.[17]  Plaintiffs have also submitted testimony that racial graffiti would stay up for days or weeks until people cleaned and emptied the port-a-johns.[18]

In addition, whether Walsh exercised reasonable care to prevent and correct any racial harassment will be an issue common to the class.  It is significant that Walsh's construction supervisors would have worked on multiple construction sites over the course of the class period. Kuna, for example, testifies that he worked on thirteen different jobs between 1997 and 2002 and that he was rehired by Walsh in 2007, despite the EEOC's determination that he had contributed to a racially hostile work environment at Walsh.  Given the cyclical nature of construction work, the frequent transfer of personnel between sites, and the complete lack of on-the-job oversight by corporate management, this case is not like the multi-facility or multi-division discrimination cases that Walsh relies upon in its opposition brief.  *See Bennett* v. *Nucor Corp.*, 656 F.3d 802 (8th Cir. 2011); *Carlson* v. *C.H. Robinson Worldwide, Inc.*, No. Civ. 02-3780, 2005 WL 758602 (D. Minn. Mar. 31, 2005); *Reid* v. *Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655 (N.D. Ga. 2001); *Faulk* v. *Home Oil Co., Inc.*, 184 F.R.D. 645 (M.D. Ala. 1999).  Nor, for these same reasons, is it necessary for plaintiffs to show that racial harassment was explicitly supported by Walsh's corporate management in order to demonstrate a commonality of issue.  *Compare with*

---

[17] Crummie testified that he had heard black employees complain about Kuna but that "so far as I'm concerned . . . it wasn't my business" because Kuna worked on "another job."  Crummie conceded that people often referred to plaintiff Jackie White's crew as "the black crew" on the Skybridge project, because most of the other crews were white or Hispanic.  Taheny testified that DeBoer, who managed the Concrete Laborers Division, "could have said the nigger word in front of me" but that it would not have been "in such a way that it would be taken as being an affront to anybody."  When DeBoer was asked whether he had ever called a black employee a "nigger" during the EEOC investigation, he implausibly stated that he could not remember.

[18] Kuna stated that he frequently painted over graffiti with spray paint on Walsh job sites but that "here's the thing, I'm a project superintendent I'm not a fucking monitor of the toilets."

*Adams*, 2001 WL 336830, at *13.   It is enough that Walsh's management allegedly knew of certain supervisors' harassing conduct yet nevertheless transferred these supervisors from job to job, over several years, without any oversight.   Finally, Walsh makes much of the fact that some plaintiffs testified that they did not experience racial discrimination at every Walsh construction site.   Whether this testimony precludes a finding of a hostile work environment is a merits issue.[19]

For all of these reasons, plaintiffs' hostile work environment class satisfies Rule 23(b)(2)'s commonality requirement.   Plaintiffs class will be limited, however, to blacks who were worked on Walsh's construction sites, as opposed office employees or other support personnel.

## II.     Whether the Claims or Defenses of the Class Representatives are Typical of the Class

The typicality requirement focuses on the class representatives.   As the Supreme Court has acknowledged, however, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge."   *Falcon*, 457 U.S. at 158 n.13.   In general, "[a] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory."   *Keele*, 149 F.3d at 595 (quoting *De La Fuente* v. *Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)).   The

---

[19] In addition, in doing so, Walsh overstates the significance of plaintiffs' testimony regarding the pervasiveness of discrimination at Walsh.   Plaintiff Jackie White, for example, testified that Robert Kuna had harassed him while he was working on the Skybridge site.   White admitted that he had previously worked with Kuna on five other projects, and that he didn't have any "clash-ins" with Kuna on the other jobs.   White qualified this statement, however, by asserting that Kuna was a "serious, serious problem."   When White was asked why Kuna "became such a problem just at Skybridge" he replied, "He probably was the same way all the time.   It's just I just experienced it at the Skybridge."

existence of defenses against certain class members does not defeat typicality. *Wagner* v. *NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996).

### A.     Disparate Impact Work Hours/Compensation Class and Promotion Class

The class representatives, along with the unnamed class members, were subject to the same allegedly unlawful employment practice.  Their claims are based on the same legal theory and are subject to the same defenses.  Although differences in class representatives' and the class members' injuries and treatment times are undeniable, this is not fatal to a finding of typicality as "[t]ypical does not mean identical." *Gaspar* v. *Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996).

Walsh argues that some of the plaintiffs' claims are not typical of the class because in certain years they exceeded the average hours worked by all laborers employed by Walsh in the Chicago Metropolitan area, or worked at or near the average.  In addition, some plaintiffs received more overtime than the average laborer in certain years.  These objections relate to damages, not theories of liability or applicable defenses.  Plaintiffs' disparate impact claims are governed by the same legal theories and will be subject to the same common proof as the class members' claims.  Therefore plaintiffs' proposed work hours/compensation class and promotion class satisfy Rule 23(a)(3)'s typicality requirement.

### B.     Hostile Work Environment Class

Plaintiffs' proposed hostile work environment also satisfies Rule 23(a)(3)'s typicality requirement.  Plaintiffs, along with the unnamed class members, were subject to the same alleged

hostile work environment. The same legal theories and defenses are relevant to their claims. Therefore plaintiffs' claims are typical of the class.

## III.    Adequacy of Class Representatives

To meet Rule 23's adequacy of representation requirement, "the representative must be able to 'fairly and adequately protect the interests of the class.'" *Keele*, 149 F.3d at 594 (quoting Fed. R. Civ. P. 23(a)(4)). The requirement has "two parts: 'the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest' of the class members." *Retired Chicago Police Ass'n* v. *City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993) (quoting *Sec'y of Labor* v. *Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986) (en banc)). Walsh does not contest the adequacy of plaintiffs' class counsel. Nor does Walsh challenge the adequacy of the class representatives with respect to the hostile work environment class.

With respect to the disparate impact classes, Walsh argues (1) that Jackie White and Bolden cannot be class representatives for a work hours/overtime class because they were employed as foremen during the relevant time period, and (2) none of the named plaintiffs can represent a promotion class because they do not allege that they were denied a promotion while they were working at Walsh. Both of these arguments raise issues relating to plaintiffs' standing to sue as class representatives.

To have standing to sue as a class representative, a plaintiff "must be part of that class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents." *Keele*, 149 F.3d at 592–93 (quoting *Schlesinger* v. *Reservists Comm. to Stop the War*, 418 U.S. 208, 216, 94 S. Ct. 2925, 41 L. Ed. 2d 706 (1974)); *E. Tex. Motor*

24

*Freight Sys. Inc.* v. *Rodriguez*, 431 U.S. 395, 403, 97 S. Ct. 1891, 52 L. Ed. 2d 453 (1977).
Jackie White and Bolden cannot serve as class representatives because they were not employed
as journeymen during the relevant time period. As discussed *supra*, in response to Walsh's
supplemental submissions on *Wal-Mart*, plaintiffs have asserted that their proposed classes are
limited to "a single job category (journeyman laborer)." (*See* Dkt. #162 at 3.) Plaintiffs'
statistical evidence of work hours and overtime disparities is also limited to journeymen.
Therefore White and Bolden, who were employed only as foremen, are not part of the class.
Walsh raises no objection to the other class representatives under Rule 23(a)(4). Therefore the
fact that Jackie White and Bolden cannot serve as class representatives does not defeat plaintiffs'
motion for certification of a work hours and compensation class.

Plaintiffs' motion to certify a promotion class, on the other hand, must be denied. No
named plaintiff alleges that he or she was denied a promotion at Walsh and none include a claim
of failure to promote in their EEOC charge. (*See* Compl. Ex. A.) Therefore they are not
members of the class they purport to represent and do not have standing to sue as class
representatives. *See Harriston* v. *Chicago Tribune Co.*, 992 F.2d 697, 703–04 (7th Cir. 1993);
*Ekanem* v. *Health & Hosp. Corp. of Marion Cnty., Ind.*, 724 F.2d 563, 572 (7th Cir. 1983).
Moreover, plaintiffs have failed to submit anecdotal evidence suggesting that any unnamed class
members intend to allege that they were qualified for a promotion that they did not receive.
Plaintiffs' motion for certification of a promotion class will be denied for failure to meet the
requirements of Rule 23(a)(4). *See Harriston*, 992 F.2d at 703–04.

**IV.    Whether Plaintiffs' Proposed Classes Meet the Requirements of Rule 23(b)**

Plaintiffs request monetary relief that includes back pay, front pay, lost benefits, preferential rights to jobs, compensatory damages, and punitive damages. (Compl. at 25–26.) They also request an injunction that would require Walsh to change its employment practices. Plaintiffs concede that the court cannot certify a Rule 23(b)(2) class that would provide all of these requested forms of relief because the monetary relief would not be "incidental" to the injunction. *See Wal-Mart*, 131 S. Ct. at 2557; *id.* at 2561 (Ginsburg, J., concurring in part and dissenting in part); *Randall* v. *Rolls-Royce Corp.*, 637 F.3d 818, 825–26 (7th Cir. 2011); *Jefferson* v. *Ingersoll Int'l Inc.*, 195 F.3d 894, 898–99 (7th Cir. 1999) (discussing *Allison* v. *Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998)).

The Seventh Circuit has instructed district courts to consider three alternatives for handling class action claims that, as here, request both an injunction and monetary relief. *See Lemon* v. *Int'l Union of Operating Eng'rs, Local No. 139, AFL-CIO*, 216 F.3d 577, 581 (7th Cir. 2000) (citing *Jefferson*, 195 F.3d at 898–99). First, the court may certify the entire proceeding under Rule 23(b)(3). *Id.* Second, the court may authorize divided certification of a Rule 23(b)(2) class for an injunction and a Rule 23(b)(3) class for damages. *Id.* Third, the court may certify a Rule 23(b)(2) class for an injunction and monetary relief but require notice and the opportunity to opt-out pursuant to its plenary authority under Rules 23(d)(2) and (d)(5). *Id.* at 582; *accord Allen* v. *Int'l Truck & Engine Corp.*, 358 F.3d 469, 471–72 (7th Cir. 2004); *but see* Joseph M. McLaughlin, *McLaughlin on Class Actions* § 5:20 (8th ed., updated Nov. 2011) (noting that the validity of "hybrid" classes after *Wal-Mart* is unclear). Plaintiffs request either the first or second option.

26

### A.    Rule 23(b)(2)

Certification under Rule 23(b)(2) is appropriate where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).  Walsh argues that the court cannot certify a Rule 23(b)(2) class because none of the named plaintiffs is currently employed at Walsh and therefore they lack standing to represent a class of plaintiffs seeking injunctive relief.  The parties have cited district court cases that reach contrary conclusions as to whether former employees may represent a class seeking injunctive relief in an employment discrimination case. *Compare In re FedEx Ground Package Sys., Inc., Emp't Practices Litig.*, 273 F.R.D. 424, 438 (N.D. Ind. 2008) (former employees have standing);  *Walker* v. *Bankers Life & Cas. Co.*, No. 06 C 6906, 2007 WL 2903180, at * 7 (N.D. Ill. Oct. 1, 2007) (same); *Ladegaard* v. *Hard Rock Concrete Cutters, Inc.*, No. 00 C 5755, 2000 WL 1774091, at *6 (N.D. Ill. Dec. 1, 2000) (same); *with Butler* v. *Ill. Bell Tel. Co.*, No. 06 C 5400, 2008 WL 474367, at *7 (N.D. Ill. Feb. 14, 2008) (former employees do not have standing);  *Smith*, 234 F.R.D. at 666 (same); *Hawkins* v. *Groot Indus., Inc.*, No. 01 C 1731, 2003 WL 22057238, at *2–3 (N.D. Ill. Sept. 2, 2003) (same).  The Seventh Circuit has not addressed this issue. *Wal-Mart*, however, suggests that the Ninth Circuit was correct in concluding that the former employees in that case lacked standing to seek injunctive or declaratory relief. *See* 131 S. Ct. at 2559–60.

The court need not decide this thorny issue because it is clear that certification of a Rule 23(b)(2) class is not appropriate. *See Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591, 612–13, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997) (because class certification issues were dispositive, Court did not reach Article III standing issues raised by objectors to class action settlement).  In

*Wal-Mart*, the Supreme Court emphasized that the validity of a Rule 23(b)(2) class depends on whether the injunctive relief is appropriate to the class "*as a whole*." *See* 131 S. Ct. at 2560 (quoting Fed. R. Civ. P. 23(b)(2) (emphasis in original)). When a significant percentage of the class members are not current employees, injunctive relief will not benefit the entire class. *See id.* Given the transitory nature of construction work, it is likely that many class members, like the named plaintiffs, are no longer employed at Walsh. Therefore injunctive relief will not be appropriate to the class as a whole. Plaintiffs will only be permitted to seek class certification under Rule 23(b)(3).

### B.    Rule 23(b)(3)

Rule 23(b)(3) provides that a class can be maintained if "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Issues that are relevant include (1) the class members' interests in individually controlling the prosecution or defense of separate actions, (2) the extent and nature of any ongoing litigation, (3) the desirability or undesirability of concentrating the litigation of plaintiffs' claims in this forum, and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)–(D). To determine whether predominance and superiority are satisfied, courts examine "the substantive elements of plaintiffs' claims, the proof necessary for those elements, and the manageability of trial on those issues." *Reed* v. *Advocate Health Care*, No. 06 C 3337, 2009 WL 3146999, at *4 (N.D. Ill. Sept. 28, 2009) (citing *Simer* v. *Rios*, 661 F.2d 655, 672–73 (7th Cir. 1981)).

### i.    Disparate Impact Work Hours/Compensation Class

28

To prevail on their disparate impact claim, plaintiffs will need to show that Walsh's policy of supervisory discretion resulted in a disparate impact on black journeymen. *See, e.g.*, *City of Chicago*, 351 F.3d at 311–12. Once this impact is shown, Walsh must demonstrate that the practice is justified by a "business necessity." *Id.* The burden then shifts back to plaintiffs to show that an alternative employment practice exists. *Id.* at 312.

All of the elements of plaintiffs' disparate impact claim are subject to common proof. The key issue will be the strength of plaintiffs' statistical evidence, and the same statistical evidence will be relevant to all of the class claims. Walsh's demonstration of a business necessity, and plaintiffs' attempt to rebut that showing, will also be subject to common proof for all of the putative class members' claims.

Walsh argues that common issues will not predominate because each plaintiffs' claim will require individualized proof of their supervisor's discriminatory intent and the circumstances under which they were denied work hours or overtime. The issue of intent relates to plaintiffs' disparate treatment claims, which will not be certified for class action proceedings. Walsh's concern about the individual circumstances of each plaintiff relates primarily to the issue of damages. In general, however, courts focus on issues relating to liability, not damages, when determining whether the predominance requirement has been met. *See Arreola* v. *Godinez*, 546 F.3d 788, 801 (7th Cir. 2008); *Kohen* v. *Pac. Inv. Mgmt. Co.*, 244 F.R.D. 469, 480 (N.D. Ill. 2007), *aff'd*, 571 F.3d 672, 677 (7th Cir. 2010); *Fletcher* v. *ZLB Behring LLC*, 245 F.R.D. 328, 332 (N.D. Ill. 2006); *Katz* v. *Comdisco, Inc.*, 117 F.R.D. 403, 412 (N.D. Ill. 1987); *see also Federal Practice & Procedure* § 1778 (3d ed. updated through 2011); 5 *Moore's Federal Practice – Civil* § 23.45 (3d ed. updated through 2012). To the extent such inquiries

29

will be necessary to a determination of damages, solutions can be devised to make the inquiry fair, efficient, and manageable.  Taking the foregoing into account, Rule 23(b)(3)'s predominance requirement is met.

In addition, resolving the disparate impact claim through a class action would be more efficient than hundreds of individual suits.  Walsh does not present any compelling argument regarding superiority, instead reiterating the same objections that related to predominance.  For all of these reasons, plaintiffs' work hours/compensation class meets Rule 23(b)(3)'s predominance and superiority requirements.  Plaintiffs' motion for certification of this class will be granted.

### ii.    Hostile Work Environment Class

As discussed *infra*, plaintiffs' hostile work environment claim will require proof that plaintiffs were harassed on account of their race, that the harassment was subjectively and objectively hostile, that the harassment was severe or pervasive so as to interfere with their ability to perform their duties, and that there is a basis for Walsh's liability.  *See Rhodes*, 359 F.3d at 505.  If no adverse employment action resulted, Walsh may present an affirmative defense to employer liability under the Supreme Court's decisions in *Ellerth* and *Faragher*, which would require it to demonstrate that it exercised reasonable care to prevent and correct any harassing behavior and that plaintiffs unreasonably failed to take advantage of any preventive or corrective opportunities.  *See Ellerth*, 524 U.S. at 766; *Faragher*, 524 U.S. at 807.

The common questions of whether certain supervisors created an objectively hostile work environment and whether Walsh management knew of the supervisor's actions and failed to correct their behavior will be significant to all of the class members' hostile work environment

claims. These issues will also be subject to common proof. Although there will undoubtedly be differences among work sites and individual employee's experiences, the court is not convinced that any individual issues will overwhelm the common issues. "'[P]redominate' should not be automatically equated with 'determinative' . . . when one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3)." *Federal Practice & Procedure* § 1778; *see also* 5 *Moore's Federal Practice* § 23.45 ("Courts generally agree that the predominance of common issues does not mean that common issues merely outnumber individual issues. Nor should a court determine predominance by comparing the time that the common issues can be anticipated to consume in the litigation to the time that individual issues will require. Otherwise, only the most complex common issues could predominate . . . ."). Indeed, plaintiffs' evidence indicates that similar conduct is at the heart of all of the class members' claims. Therefore despite the number of construction sites involved, the proof of offensive conduct may be similar for all class members. *See Warnell*, 189 F.R.D. at 387; *Markham*, 171 F.R.D. at 224.

Walsh argues that plaintiffs' claims are not subject to common proof because the court will need to determine whether each individual employee found Walsh's work environment to be subjectively hostile. *See Radmanovich* v. *Combined Ins. Co. of Am.*, 216 F.R.D. 424, 437 (N.D. Ill. 2003) (declining to certify hostile work environment class because a pattern or practice finding of a hostile work environment would not resolve the issue of whether each individual found the work environment to be subjectively hostile); *but see Palmer* v. *Combined Ins. Co. of Am.*, 216 F.R.D. 430, 440 (N.D. Ill. 2003) (certifying hostile work environment class under Rule 23(b)(3) where underlying facts were the same as those in *Radmanovich*). The court disagrees.

31

"[T]he landscape of the total work environment, rather than the subjective experiences of each individual claimant, is the focus for establishing a pattern or practice of . . . harassment which is severe and pervasive." *Warnell*, 189 F.R.D. at 387 (quoting *EEOC* v. *Mitsubishi Motor Mfg. of Am., Inc.*, 990 F. Supp. 1059, 1074 (C.D. Ill. 1998)). There can be little question that black employees would have been offended by the alleged conduct that is at the heart of plaintiffs' hostile work environment case. *See id.*; *Int'l Truck & Engine Corp.*, 358 F.3d at 472 (noting that the "employer's contention that even partial class certification is inappropriate because workers may have *liked* being called 'nigger' and 'jungle bunny,' chuckled when other workers . . . displayed nooses in the workplace, or at least not minded such things, strains credulity"). If the evidence indicates that certain employees were not offended by the conduct of Walsh's supervisors, then individual evidence regarding subjective reactions can be presented. *See Int'l Truck & Engine Corp.*, 358 F.3d at 472.

In addition, Rule 23(b)(3)'s superiority requirement has been met. Concentrating separate actions based on the same underlying conduct in one action promotes judicial economy and efficiency and consistency of judgments. Although some difficulties may be encountered in managing the class action, the court is confident that the parties can devise solutions to address these issues and ensure that the adjudication of the case is both fair and efficient.

Taking the foregoing into account, plaintiffs have satisfied Rule 23(b)(3)'s predominance and superiority requirements. The court will certify plaintiffs' hostile work environment class under Rule 23(b)(3).

## CONCLUSION AND ORDER

32

Plaintiffs' motion for class certification [#128] is granted in part and denied in part. Because plaintiffs have satisfied the necessary elements of Rule 23(a) and Rule 23(b)(3), the court will certify the following hostile work environment class: All blacks employed by Walsh on its construction sites in the Chicago Metropolitan area during the time period June 1, 2001, through the present. The named plaintiffs are appointed class representatives of the hostile work environment class.

The court will also certify the following disparate impact class: All blacks employed as journeymen by Walsh in the Chicago Metropolitan area at any time during the period June 1, 2001, through the present, who were denied opportunities to work, not afforded overtime hours or not afforded premium pay hours, because of their race. Plaintiffs Gregory Chism, Donald Duncan, Lindell Epps, James Gage, Marvin Green, Terrance Jackson, Joe Jones, Eddie Lucas, Guy Sutton, and Zelma White are appointed class representatives of the work hours and compensation class. This case is set for a status on May 1, 2012 at 8:30 a.m.

Dated: March 30, 2012                    Enter:_____

                                         JOAN HUMPHREY LEFKOW
                                         United States District Judge